[redacted]

**Allan H. STARR, as executor of the estate of Elizabeth (Betty) Sampson, individually and on behalf of all others similarly situated, Plaintiff–Appellant,**

v.

**GEORGESON SHAREHOLDER, INC., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corporation and Vodafone Group, PLC, Defendants–Appellees.**

**Allan H. Starr, as executor of the estate of Elizabeth (Betty) Sampson, individually and on behalf of all others similarly situated, Plaintiff–Appellant,**

**James L. Jerome, on behalf of all others similarly situated, Consolidated–Plaintiff,**

v.

**Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc., Georgeson Shareholder Securities Corporation and AT&T Corporation, Defendants–Appellees.**

**Nos. 03–9267, 04–2067–CV.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 3, 2005.

Decided: June 15, 2005.

[redacted]

104

Peter P. Kahana, Berger & Montague, P.C., Philadelphia, PA (H. Laddie Mon-

tague, Jr. and Jenna MacNaughton–Wong, Berger & Montague; Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, New York, NY; and Steven J. Toll, Andrew N. Friedman and Adam T. Savett, Cohen, Milstein, Hausfeld & Toll, Washington, DC, on the brief), for Plaintiff–Appellant.

Eli R. Mattioli, Thelen Reid & Priest LLP, New York, N.Y. (Robert J. Saville, Irena S. Brobston and Brett E. Wiggins, Thelen Reid & Preist, on the brief), for Defendants–Appellees Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc. and Georgeson Shareholder Securities Corporation.

Theodore Edelman, Sullivan & Cromwell LLP, New York, N.Y. (Stephanie G. Wheeler and Jill D. Fairbrother, Sullivan & Cromwell, on the brief), for Defendant–Appellee Vodafone Group, Plc.

M. Norman Goldberger, Wolf, Block, Schorr & Solis–Cohen LLP, Philadelphia, PA (Adam H. Cutler, Wolf, Block, Schorr & Solis–Cohen LLP; and George R. Hinckley, Jr., Traiger & Hinckley LLP, New York, NY, on the brief), for Defendant–Appellee AT&T Corporation.

Before: FEINBERG, WINTER and SOTOMAYOR, Circuit Judges.

FEINBERG, Circuit Judge.

In these two separate cases, Allan H. Starr, as executor of the Estate of Elizabeth Sampson and on behalf of all others similarly situated, appeals from two judgments of the United States District Court for the Southern District of New York (Stanton, J.) dismissing his class action complaints for failure to state a claim upon which relief could be granted. Starr commenced the first action in November 2002 against Georgeson Shareholder, Inc., Georgeson Shareholder Communications, Inc. and Georgeson Shareholder Securities Corporation (collectively, "Georgeson") and Vodafone Group, Plc ("Vodafone"), and began the other in February 2003 against Georgeson and AT&T Corporation ("AT&T"). The complaints alleged that Vodafone, AT&T and Georgeson violated federal securities laws in conducting "Post-Merger Cleanup" ("PMC") services. Georgeson offers such services to publicly-traded companies, and was employed by the post-merger company (Vodafone and AT&T, respectively) in each of these cases. Georgeson was retained to "clean up" the mergers by locating and soliciting missing or reluctant shareholders to convert their pre-merger stock into shares of the post-merger companies. Although Georgeson charged shareholders a fee to convert the shares, the exchange agent that both Vodafone and AT&T retained, EquiServe Limited Partnership ("EquiServe"), was available to convert the shares free of charge. Starr alleges principally that Georgeson, Vodafone and AT&T violated the securities laws by failing to inform the shareholders that they could use EquiServe at no cost—rather than paying Georgeson—to convert their shares. We affirm and, because Starr's two actions involve nearly identical facts and law, dispose of both appeals in this opinion.

## I. Background

### A. Starr I

Starr first appeals from the judgment in *Starr v. Georgeson Shareholder, Inc.,* 287 F.Supp.2d 410 (S.D.N.Y.2003) ("*Starr I*"), in which he alleged that Georgeson and Vodafone violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, in their handling of the "cleanup" following the merger of AirTouch Communications,

Inc. ("AirTouch") and Vodafone.[1]

The pre-merger proxy statement from AirTouch stated that "Holders of Air-Touch common stock will not be liable for any charges in connection with the receipt of Vodafone AirTouch ADSs [the post-merger shares]." After the merger was completed, Vodafone sent a letter to Air-Touch shareholders asking them to send in their old stock certificates so they could be exchanged for new ones. Specifically, the letter indicated that each AirTouch share "will be exchanged into 0.5 Voda-fone AirTouch ADSs and $9.00 (U.S.) in cash," and stated that the AirTouch stock certificates "must be returned before they can be exchanged into Vodafone AirTouch ADSs. You will not receive Vodafone Air-Touch Plc dividends on shares formerly represented by AirTouch certificates or be able to exercise the right to vote your new Vodafone Airtouch ADSs until you return these certificates." The letter urged shareholders to "[r]eturn your completed Transmittal Form along with your Air-Touch common stock certificate(s) to EquiServe, the Exchange Agent for the transaction, in the enclosed pre-addressed envelope *as soon as possible*" (emphasis in original). The letter also provided shareholders with a question-and-answer brochure along with EquiServe's toll-free telephone number in case shareholders had "any additional questions regarding the exchange." A subsequent letter from Vodafone, titled "Second Notification," was mailed to AirTouch shareholders who had not sent their stock certificates to EquiServe in response to the first. This letter emphasized that the AirTouch cer-tificates "*must* be returned before they can be exchanged" (emphasis in original). The second letter, like the first, provided

shareholders with a question-and-answer brochure and EquiServe's toll-free tele-phone number. Neither letter indicated whether EquiServe charged a fee for its services.

After the Vodafone letters were mailed and some shareholders had not returned their old stock certificates, Vodafone di-rected Georgeson to proceed with its PMC services. Georgeson thus sent out a notice informing the non-tendering shareholders that

> [a]t various times, you have been noti-fied to send in your stock certificate(s) in exchange for Vodafone ADSs and the cash distribution. Georgeson Share-holder Communications Inc. has now been retained to assist you in claiming your Vodafone ADSs and cash payment. To claim your Vodafone ADSs, you may complete the Claim Card below and re-turn it along with your stock certifi-cate(s) in the envelope provided. *Even if you have lost your certificate(s), you may still participate in this voluntary program* ....
>
> In order to defray the cost of providing you this service, a processing fee of $3.50 per **Vodafone** ADS due you will be deducted from your proceeds and paid to Georgeson Shareholder Securi-ties Corporation, a registered broker dealer. The Vodafone ADSs and cash to which you are entitled cannot be sent to you until you surrender your old certifi-cate(s). Eventually, if you continue to do nothing, your assets will be turned over to state authorities under the aban-doned property laws

(emphasis in original). Subsequently, Georgeson sent out three more notices that were substantially the same as the first.[2]

---

1. Starr also raised certain state law claims that he later withdrew.

2. Georgeson mailed four notices, respectively dated August 1, 2000, September 25, 2000, November 6, 2000, and January 8, 2001.

Starr, acting as agent for Elizabeth Sampson,[3] tendered 916 AirTouch stock certificates and received 2290 Vodafone shares and a cash payment of $8,264, from which Georgeson deducted $8,015 pursuant to its stated fee. Starr alleges that the fee amounted to roughly nine percent of the stock's value. Starr subsequently filed the complaint in *Starr I*, alleging that he and similarly situated shareholders "were tricked into believing that they had only two choices: pay Georgeson the exorbitant processing fee to receive at least some of the value of their shares before it would be too late, or else forfeit their shares to the state under the abandoned property laws." Starr alleged that "[h]ad the Class known that they could have exchanged their shares for free by contacting the exchange agent [EquiServe] directly, or could have paid a nominal amount by merely contacting another broker, they would have done so, and thereby saved substantial amounts of money." Starr claimed that the Georgeson notices, sent out pursuant to Vodafone's directions, materially misled shareholders and therefore violated federal securities laws.

In his opinion filed in October 2003, Judge Stanton disagreed. The judge stated that the existence of "alternative, and cheaper, methods of effecting the exchange did not render the Georgeson statements untruthful. Those statements were accurate as far as they went." 287 F.Supp.2d at 413. Georgeson's failure to inform the shareholders that EquiServe would exchange their stock at no charge was not a material omission, the court reasoned, because "the availability of the alternative means was already part of the 'mix' of information readily available (in fact, mailed directly) to the AirTouch stockholders, who had been informed of the cost-free exchanges available through EquiServe, in Vodafone's two earlier mailings." *Id.* The district court concluded that "[a]ny AirTouch stockholder dissatisfied with the Georgeson proposition could with minimal diligence have investigated the already-disclosed alternative means of exchange." *Id.* at 414. The court also rejected Starr's argument that Georgeson had not adequately disclosed its allegedly excessive fee, finding that Georgeson's notices "showed the number of Vodafone ADSs [Ms. Sampson] would receive in the exchange, and . . . stated the processing fee was $3.50 per Vodafone ADS. Requiring the stockholder to perform the two-minute multiplication to ascertain the fee is not an 'omission' for which the law gives redress." *Id.* at 413–14. Accordingly, the court dismissed Starr's complaint.[4]

## B. Starr II

Starr also appeals from the judgment in *Starr v. Georgeson Shareholder, Inc.*, No. 03 Civ. 1163(LLS) (S.D.N.Y. March 23, 2004) ("*Starr II*"), which involved a merger between MediaOne Group, Inc. ("Me-

**3.** Starr was made the duly authorized agent of Elizabeth Sampson by a Power of Attorney executed in January 1990. Acting as Ms. Sampson's agent, Starr tendered her Air-Touch shares in January 2001. Ms. Sampson passed away in June 2002. Starr filed his complaint in November 2002.

**4.** Although the district court granted the defendants' motion to dismiss, which the court said was premised on Federal Rules of Civil Procedure 12(b)(6) and 9(b), see 287 F.Supp.2d at 411, the court did not discuss the motion with regard to Rule 9(b). Because the district court expressed no opinion regarding the viability of Starr's complaint under Rule 9(b)—which requires allegations of fraud to be pled with particularity—we express no opinion either. But because we agree with the district court that Starr's complaint was properly dismissed pursuant to Rule 12(b)(6) for failing to state a claim upon which relief could have been granted, the Rule 9(b) question is moot.

diaOne") and AT&T. The facts of that case are essentially the same as those of *Starr I*: EquiServe was the exchange agent, AT&T sent out notices after the merger instructing shareholders to send in their old MediaOne stock certificates, additional notices were sent to the non-tendering shareholders, Starr again tendered certificates on behalf of Ms. Sampson and thereafter again filed a complaint alleging that the post-merger notices violated federal securities laws.

The initial AT&T notices informed shareholders that "you must return your MediaOne Group stock certificate(s) along with the completed and signed Election Form using the enclosed insured and pre-addressed envelope," and advised shareholders to "remember that MediaOne Group common stock is no longer traded on any stock exchange, and until we receive your certificates and the AT&T/MediaOne Exchange Form you cannot receive any AT&T shares, cash payments, dividends, or be eligible to participate in future AT&T shareowner meetings." The question-and-answer pamphlet included with the notices advised shareholders that they could "elect how ... to exchange the[ir] MediaOne shares ... [by] return[ing] the enclosed Election Form in the enclosed pre-addressed envelope to the Exchange Agent, EquiServe Trust Company ...." AT&T's initial notices did not indicate whether the MediaOne shareholders would be charged a fee for exchanging their shares.

The follow-up notices stated that AT&T had

> retained Georgeson Shareholder Communications, Inc. to assist you in claiming your shares and cash. We urge you to claim these shares now. You may choose to have the AT&T shares due you sold on the open market or have them sent to you. To defray the cost of providing you with this service, a processing fee of $7 per AT&T share due you will be deducted from the additional cash payment of $36.27 per MediaOne share you are due, and paid to Georgeson Shareholder Securities Corporation, member of NASD and SIPC. **Even if you do not have your MediaOne certificate(s), you may still participate in this voluntary program**

(emphasis in original). The notices included, as in *Starr I*, informational brochures and references to toll-free telephone numbers that shareholders could call for assistance. Unlike in *Starr I*, however, the pre-merger proxy statement in *Starr II* did not state that shareholders were entitled to exchange their shares for free.

Acting on behalf of Ms. Sampson, Starr tendered 916 MediaOne shares and received 869 AT&T shares and a cash payment of $33,223.32, from which Georgeson deducted $6,083 pursuant to its stated fee. Starr alleges that the fee amounted to roughly 12 percent of the value of the stock. Starr filed a complaint alleging the same violations of federal securities laws he had alleged in the complaint in *Starr I*.

In his Memorandum Opinion filed in March 2004, Judge Stanton dismissed the complaint

> for the reasons stated in *Vodafone*, reported as *Starr v. Georgeson Shareholder, Inc.*, 287 F.Supp.2d 410 (S.D.N.Y. 2003). The sole reason offered by plaintiffs for avoiding *Vodafone*'s result is that the proxy statement in this case did not specifically state that MediaOne and EquiServe would impose no charge for effecting the exchange, while in *Vodafone* that fact was explicitly stated in the proxy materials. That is not a sufficient distinction. The exchange was not effected directly under the proxy statement. In both cases, the exchange was initiated pursuant to later communica-

tions (prior to Georgeson's) which instructed the former shareholders how to surrender their shares for exchange .... There was no mention of any charge for that procedure. In a transaction for which no payment was asked, the surrendering shareholder would not expect to offer any. Thus, the offering shareholder was on notice in this case, as in *Vodafone*, that the alternative of surrendering to EquiServe was free.

## II.  Discussion

■ On appeal, Starr argues that the Georgeson notices were fraudulent and misleading and that defendants' failure to inform shareholders of EquiServe's free services was a material omission. Starr also argues that defendants violated securities laws in light of the "shingle theory," discussed below, by failing adequately to disclose Georgeson's allegedly excessive fees. In response, defendants argue that the district court properly dismissed the complaint for the reasons given in the district court opinions, and for the additional reasons that the complaints failed to properly allege scienter and were untimely.

We review dismissals pursuant to Rule 12(b)(6) de novo. See, e.g., *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship*, 380 F.3d 126, 129 (2d Cir.2004). In doing so, "we accept all of plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff."

*Id.* at 129–30 (citations and internal quotation marks omitted). We also consider "documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir.1996) (citation and internal quotation marks omitted).

To state a claim under § 10(b) of the Securities Exchange Act or Rule 10b–5, a plaintiff must plead that the defendant (1) made a false material representation or omitted a material fact, (2) with scienter, and (3) that the plaintiff's reliance on defendant's action caused plaintiff injury. See *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001). Starr failed to state a claim in his complaints for at least two reasons. First, he did not plead justifiable reliance on the allegedly misleading statements.[5] See *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir.1993). Second, to the extent that Starr protests a misleading omission, he failed to allege facts that would meet the materiality requirement of § 10(b). See *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 329 (2d Cir.2002).

■ "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Brown*, 991 F.2d at 1032. In both *Starr I* and *Starr II*, the merger's surviving company sent two detailed letters offering share-exchange ser-

---

**5.** For claims "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992). The claims here, however, are not "primarily" omission claims. On the contrary, Starr focuses most heavily on allegedly misleading statements made in the Georgeson letters and claims that these "statements—individually and collectively—intentionally left shareholders with the overall *false* impression that they had no choice but to exchange their ... shares through Georgeson" (emphasis in original). Plaintiff's principal objection to the omissions in the letters is that the omissions exacerbated the misleading nature of the affirmative statements in the letters.

vices without mention of a fee. In both cases, Starr subsequently received additional letters offering Georgeson's share-exchange services for a fee. All of the letters included instructions for acquiring additional information regarding the share exchange. Under these circumstances, we agree with the district court in *Starr I* that a shareholder "with minimal diligence [would] have investigated the already-disclosed alternative means of exchange." 287 F.Supp.2d at 414. Specifically, such a shareholder would have either utilized the free service or sought clarification regarding fee payment obligations before paying Georgeson's fee. We thus reject Starr's assertion that the "PMC Notices gave the impression that Georgeson was the only means by which shareholders could exchange their shares, by implying that the shareholders were too late to participate in the normal share exchange previously offered by EquiServe . . . ." We agree with the district court in *Starr I* that although Georgeson's notices "do convey a sense of urgency to act . . . [they] were accurate as far as they went." 287 F.Supp.2d at 413.

■ With respect to the alleged omissions, Starr fails to demonstrate materiality. To fulfill the materiality requirement under § 10(b), "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation and internal quotation marks omitted); *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002). The "total mix" of information includes all information "reasonably available to the shareholders," including "data sent to shareholders by a company." *Press v. Quick & Reilly, Inc.,* 218 F.3d

121, 130 (2d Cir.2000) (citation and internal quotation marks omitted).

In both *Starr I* and *Starr II,* the information "reasonably available to the shareholders" included two detailed letters from the surviving companies offering share-exchange services without mention of a fee, subsequent notices offering Georgeson's exchange services for a fee and instructions for acquiring additional information. Moreover, the letters or informational pamphlets from the surviving companies specifically stated that EquiServe was the exchange agent. While a superficial or careless reading of these documents might lead some investors to conclude erroneously that they must pay Georgeson's fee, there is no basis for finding a "substantial likelihood" that a "reasonable investor" would do so. *Basic Inc.,* 485 U.S. at 231–32, 108 S.Ct. 978.

In his briefs, Starr argues that there was "serious doubt whether the market truly knew about any alternative means of exchange," and that "there is nothing in the record to support the factual inference that both the . . . notices were sent to the same group of . . . shareholders." We disagree. First, the relevant question is not whether the market "truly knew" any specific piece of information, but whether the information was "reasonably available." Second, Starr's complaints allege that the initial letters from Vodafone and AT&T were sent to shareholders, and neither complaint alleges that Starr did not receive them.

Because Starr has failed to satisfy the materiality requirement and cannot demonstrate justifiable reliance, we affirm the dismissal of his complaints without addressing the parties' arguments regarding scienter and timeliness.

■ We turn finally to Starr's claim that the fees Georgeson charged for its share-conversion services were excessive,

and that Georgeson thus had a duty under the "shingle theory" to disclose such fees. Under the shingle theory, a "securities dealer creates an implied duty to disclose excessive markups by 'hanging out its professional shingle.'" *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 192 (2d Cir.1998) (citation omitted). Although the shingle theory has traditionally been applied to broker-dealers who sell securities at a markup,[6] we see no reason not to apply the theory to exchange agents, like Georgeson, that convert stock certificates for a fee.

■ Thus under the shingle theory and " § 10(b) of the Exchange Act, [an exchange agent] has a duty to disclose the details of [its fee] if the [fee] is 'excessive.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2d Cir.2000) (citation omitted). Even if Georgeson's fees were excessive—and we express no opinion as to whether they were—we agree with the district court that Georgeson adequately disclosed them. The court expressly held that the statements in the notices regarding Georgeson's $3.50 and $7 processing fees rendered Starr's claim of inadequate disclosure "unsustainable." *Starr I*, 287 F.Supp.2d at 413. Simply multiplying these fees by the number of stock certificates held would have provided a shareholder with the fee Georgeson charged to exchange the shares. We agree that "[r]equiring [a] stockholder to perform the two-

minute multiplication to ascertain the fee is not an 'omission' for which the law gives redress." *Id.* at 414.

As Starr himself concedes, Georgeson had a duty in this regard only to "either not charge excessive markups on securities transactions, or else to make sufficient disclosures so as to permit investors to make an informed decision about the transaction." See Grandon, 147 F.3d at 192 (noting that the "fraud" of " 'charging undisclosed excessive commissions ... is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment' ") (quoting *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1033 (3d Cir.1987)). Because Georgeson disclosed its fees, it cannot be said to have defrauded Starr simply because the fees were allegedly excessive.

### III. Conclusion

For the reasons above, we affirm the district court's dismissal of Starr's complaints.

---

6. "A markup is the difference between the price charged to a customer for a security and the prevailing market price for the securi-

ty...." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 533 n. 2 (2d Cir.1999).