In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-4398

LILA T. GAVIN, on behalf of herself and
    of all persons similarly situated,

*Plaintiff-Appellant*,

*v.*

AT&T CORP. and GEORGESON SHAREHOLDER
    COMMUNICATIONS, INC.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2721—**John F. Grady**, *Chief Judge*.

_____

ARGUED JUNE 6, 2006—DECIDED SEPTEMBER 6, 2006

_____

Before FLAUM, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*.  This appeal requires us to consider the meaning of "in connection with the purchase or sale of a covered security" in the Securities Litigation Uniform Standards Act of 1998 (SLUSA), 15 U.S.C. § 78u-4 *et seq*. The Act provides that a class action, though filed in state court under state law, may be removed to federal district court if the suit alleges "(1) an untrue statement or

omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b); see also § 78bb(f). A "covered security," defined in §§ 78bb(f)(5)(E), 77p(f)(3), 77r(b), is any security "traded nationally and listed on a regulated national exchange." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1512 (2006); see also *Green v. Ameritrade, Inc.*, 279 F.3d 590, 596 n. 4 (8th Cir. 2002). The Act further provides that a suit properly removed under it must forthwith be dismissed by the federal court because a suit based on fraud in the sale of securities regulated under the federal securities laws cannot be brought under state law. §§ 77p(b), 78bb(f)(1).

The defendants, sued for fraud in an Illinois state court on behalf of a class of shareholders of MediaOne Group, Inc., removed the case to federal district court under SLUSA. The judge denied the plaintiff's motion to remand the case to the state court and dismissed the suit, whereupon the plaintiff filed a complaint in the district court under Rule 10b-5, which the district judge dismissed on the merits. The appeal mainly challenges the removal; the plaintiff wants to be back in state court, suing under state law. Only if we refuse to order the case remanded to the state court does she want us to proceed to the Rule 10b-5 issue and reverse the district court on the merits. That would place us in conflict with the Second Circuit, which in a similar case brought by other MediaOne shareholders (but in federal court, so avoiding SLUSA) held that there was no fraud. *Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103 (2d Cir. 2005).

In June 2000, MediaOne merged with AT&T. The terms of the merger entitled shareholders in MediaOne to obtain in

exchange for each of their shares 0.95 shares of AT&T stock plus $36.27 and any accrued but unpaid dividends. This package was the "Standard Election." But MediaOne shareholders could if they preferred select other combinations of shares and cash that would be equal in value to the "Standard Election" share-cash package.

AT&T notified the MediaOne shareholders of their choices on June 15 and explained that they could obtain the cash and/or AT&T shares to which the choice they made entitled them by mailing their MediaOne share certificates to EquiServe Trust Company, AT&T's exchange agent. There was no charge for this service. The notice fixed a deadline of July 14 for choosing any of the alternatives to the Standard Election, but no deadline for the Standard Election itself.

On August 1, AT&T sent a follow-up notice to those MediaOne Group shareholders who had not responded to the first notice. The letter explained that they could still exercise the Standard Election (though not the other options, the July 14 deadline having passed), again through EquiServe and again without charge.

Finally, on December 15, defendant Georgeson, hired by AT&T to perform a postmerger "clean up" or "round up," mailed a notice on AT&T letterhead to those MediaOne shareholders who still had not responded to either of the previous notices. The letter urged them to exercise their Standard Election rights by submitting their MediaOne shares to Georgeson in exchange for either a combination of cash and stock or an all-cash equivalent. The letter warned that "eventually, if you continue to do nothing, your [AT&T] stock and underlying assets will be turned over to certain state authorities under the abandoned property laws." Remember that AT&T had set no deadline for the Standard Election. Georgeson was reminding those

MediaOne shareholders who had not yet made an election, and now were confined to the Standard Election because the deadline for the alternatives had passed, that state abandonment law set a deadline.

Abandoned property escheats to the state after a specified period, Uniform Disposition of Unclaimed Property Act (1966), codified in Illinois as 765 ILCS 1025/0.05 *et seq.*, and shares of stock that are not claimed by the beneficial owner are deemed abandoned. 765 ILCS 1025/2a. Either that Act or the superseding Uniform Unclaimed Property Act (1995) have been adopted in 29 states plus the District of Columbia, and most, perhaps all, other states have similar laws. E.g., N.Y. Personal Property Law §§ 251-258 (McKinney 1992). In the state court, the plaintiff requested certification of a nationwide class and in the alternative a statewide (Illinois) class consisting of "all residents, or persons or legal entities, who [are MediaOne shareholders and] may properly avail themselves of the Illinois Consumer Fraud Act." No class was ever certified.

Georgeson's letter specified a fee of $7 per MediaOne share for the exchange service offered in the letter and did not mention that the recipients of the letter could still obtain the Standard Election package at no charge through EquiServe. The failure to mention that option is the fraud charged in the complaint.

We do not think the alleged fraud can be said to be "in connection with the purchase or sale of a covered security," namely stock in MediaOne. When the merger was consummated in June of 2000, MediaOne's shareholders became the beneficial owners of AT&T stock. Those shareholders whose MediaOne shares had been held by their brokerage firms were immediately credited with the receipt of AT&T stock plus cash. Those shareholders (the plaintiff

and the members of her class) who possessed share certificates might not get their new cash/stocks right away, but they had a firm entitlement to their proportionate share of the cash and stock that AT&T had set aside to fund the acquisition of MediaOne. The alleged fraud—the omission in Georgeson's letter of December 15 of any mention of the free option—happened afterwards and had nothing more to do with federal securities law than if Georgeson had asked the MediaOne shareholders "do you want your AT&T shares sent to you by regular mail or by courier?" and had charged an inflated fee for the courier service. Or if AT&T had said "if you don't want your spouse to learn about your good fortune, we'll send you your shares in a brown paper envelope"; and later the spouse failed to claim the shares in her divorce proceeding and sued AT&T and her husband for fraud.

AT&T didn't want the shareholders of the firm it had just bought to wake up one day and find that their part of the sale price had gone not to themselves but to a state. Hence the three notices—though why the last one neglected to remind the shareholders that they could still protect their stock from being escheated without having to pay $7 a share to another company is a puzzle, as well as the foundation of the fraud claim (about the merits of which we express no opinion). Presumably Georgeson showed AT&T the letter before mailing it; it was, after all, on AT&T's stationery.

This would be a different case from the standpoint of SLUSA had the MediaOne shareholders been induced by fraudulent representations by AT&T to vote for the merger and as a result ended up with AT&T stock worth less than the MediaOne stock that they had exchanged. E.g., *Dasho v. Susquehanna Corp.*, 380 F.2d 262 (7th Cir. 1967); Dennis F. Dunne, "Stock Repurchase Agreements in Bankruptcy: A

Tale of State Law Rights Discarded," 12 *Bank. Dev. J.* 355, 386 (1996). It is true that one option offered in the December 15 letter was that Georgeson would sell the recipient's shares and send him the cash if he preferred that to stock plus cash. But it's not as if Georgeson was trying to buy the shares on the cheap. The $7 fee it was charging for its service was its entire consideration and was the same whether the recipient wanted cash or shares. Georgeson acquired no investment interest. Shareholders would take up Georgeson's offer of the cash alternative only if they didn't want to own AT&T shares; it was their choice entirely.

One could speculate—though the plaintiff does not—that someone who had planned to sell the AT&T stock to which he was entitled as a result of the merger, but to do so later on rather than immediately, might accelerate his decision when he learned that it would cost him $7 per share to obtain the stock; he might do this in order to avoid a future brokerage fee on top of the $7. But that is no different from what would happen if a bank charged an exorbitant fee for a safe deposit box in which to keep one's shares of stock: some people would decide to sell their stock rather than pay the fee. One would hardly say that a class action against the bank in such a case would be an action "*involving* nationally traded securities," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, *supra*, 126 S. Ct. at 1514 (emphasis added), which is the Supreme Court's characterization of SLUSA's scope.

The defendants argue that since Georgeson's service charge was calculated on a per-share basis, the effect was to reduce by $7 the value of each of the AT&T shares that the MediaOne shareholders who accepted Georgeson's offer received. But that is like saying that if the shareholders had received their AT&T shares and later sold them, the value

of their shares would have been diminished by the broker-age fee on the later transaction. What happens to shares after they are sold is not "in connection with" the sale. The merger was the sale. That the beneficial owners who responded to the December 15 offer paid money to make sure that they got the shares rather than the state was no different from their paying a bank to keep the share certifi-cates in a safe-deposit box.

The defendants have confused a transaction with its sequelae. After you buy a car and drive away with your new possession, much can happen to affect the value of your purchase. If what happens is traceable to something that occurred before the sale was complete, such as a defective engine block, you may be able to undo the sale on the basis that that something happened "in connection with" the sale. But if something happens after the transac-tion is complete to make it less worthwhile to you, such as the dealer's replacing a tire that has worn out with one that is the wrong size, it is a separate wrong, not anything connected with the original sale unless the wrong is a breach of warranty.

Of course there is a literal sense in which anything that happens that would not have happened but for some prior event is connected to that event. In that sense the fraud of which the plaintiff complains is connected to the merger, without which there would not have been such a fraud against the plaintiff and her class. But in the same sense the fraud is connected to the Big Bang, without which there would never have been a MediaOne or even an AT&T.

*Gurwara v. LyphoMed, Inc.*, 937 F.2d 380 (7th Cir. 1991), illustrates the limitations of "in connection with." It held that an employer's refusal to sell an employee stock to which he was entitled by his employment contract was

not an act "in connection with the purchase or sale of securities." The alleged "misrepresentation went only to [the plaintiff's] opportunity to purchase the stock at the described price. It in no way related to the value of that stock . . . . . [It] did not go to the value of the stock at issue or the value of the consideration in return for it " *Id.* at 382-83; see also *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598-99 (8th Cir. 2002).

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), makes the general point that the cases just cited illustrate: a mere "but for" cause linking a securities transaction (here, the merger of MediaOne into AT&T) to a subsequent injury (concealment of the option to receive the Standard Election without paying any fee) does not make the injury one suffered "in connection with the purchase or sale of securities." Otherwise SLUSA would apply to a class action by shareholders who suffered paper cuts when they opened the letters informing them of their rights under the merger.

*Ketchum v. Green*, 557 F.2d 1022 (3d Cir. 1977), nails down the point: two directors alleged that they had been fraudulently induced to cast a vote that ultimately enabled other directors to fire them, which triggered a provision of their retirement plan that required terminated employees to resell their stock to the corporation at a discount. The fraud, they argued, was thus "in connection with the purchase or sale of securities." The court disagreed. It was a classic but-for case: the loss on the sale would not have occurred had it not been for the fraud, but the fraud had nothing (else) to do with that loss. As we said in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 189 (7th Cir. 1993), "the 'connection' requirement must be taken seriously." Cf. *Bellah v. First Nat'l Bank*, 495 F.2d 1109, 1114 (5th Cir. 1974).

If any doubt remains that the alleged fraud should not be deemed in connection with the purchase or sale of MediaOne stock, consider the issues that are germane to whether the Georgeson letter was indeed fraudulent. They have nothing to do with efforts to manipulate the prices of securities, with failure to make full disclosure of all facts known to the seller or issuer that might be material to a purchaser, with the regulation of stock exchanges, or with any other concern of federal securities law. They are garden-variety issues of state-law consumer fraud, such as whether a statement in the December 15 letter inviting the recipient to call Georgeson if he had any questions, in conjunction with the references to the free EquiServe option in the two previous letters, gave the class members enough information that they should blame themselves for accepting Georgeson's offer. It would be the same kind of case had the letter invited the recipient to pay $7 for Linux software that he could download for free from the Internet.

The purpose of SLUSA was to prevent plaintiffs from making an end run around the restrictions on suits for federal securities fraud suits introduced by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, 15 U.S.C. §§ 77z-1, 78u-4, by filing the suits in state courts under state law. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, *supra*, 126 S. Ct. at 1510-11; see Michael A. Perino, "Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action," 50 *Stan. L. Rev.* 273 (1998). The terms of a statute can carry beyond its purpose, to prevent the opening of loopholes. But we do not see how an interpretation that would allow removal in this case could do that. The plaintiffs are not trying to litigate a securities fraud case, but instead a consumer fraud case against companies that have made no effort to influence the purchase or sale of a covered security. "Congress, in

enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Marine Bank* v. *Weaver*, 455 U.S. 551, 556 (1982).

There is one more point to note about this case. The defendants want to be in federal court. And the complaint that the plaintiff filed in state court actually alleges the essential facts that demonstrate the presence of federal diversity jurisdiction, which would enable removal because the defendants are not citizens of the state (Illinois) of which the plaintiff is a citizen. (AT&T is a citizen of New York and Georgeson a citizen of New York and Delaware.) Yet the removal petition does not mention diversity; nor has either defendant asked us to retain jurisdiction on the basis of diversity. Georgeson's lawyer told us that the defendants had not sought removal on the alternative ground of diversity because they were certain there was jurisdiction under SLUSA. That was a mistake, but he added that he doubted that the plaintiff's complaint satisfied the requirement that the amount in controversy exceed $75,000. That was another mistake.

The complaint alleges compensatory damages of $1,645 (the 235 MediaOne shares that the plaintiff exchanged through Georgeson times the $7 fee) plus punitive damages in an unspecified amount. When the award of compensatory damages is large, a punitive-damages multiple in excess of single digits is presumptively unconstitutional. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). But a higher multiple is permissible when the expected award of compensatory damages is so small that it would be unlikely to induce a suit even of compelling legal merit, especially if there are multiple victims and an indication that the tortfeasor has been eluding liability successfully. *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d

672 (7th Cir. 2003). For these are further indications that without a hefty award of punitive damages the wrongful conduct will not be deterred.

In *Mathias* each plaintiff had received an award of $5,000 in compensatory damages, and we upheld a further award to each of $186,000 in punitive damages—a ratio of 37.2 to 1. In this case, an award of $73,355 in punitive damages would be necessary to get the plaintiff to the $75,000 threshold that one must cross to satisfy the amount-in-controversy requirement. That would be a higher ratio than in *Mathias*. But since the compensatory damages sought in this case are little more than a third as great as those in that case, one could not say as a matter of law that the plaintiff would be unable to cross the threshold; and there-fore this case really is within the diversity jurisdiction.

Some cases, it is true, appear to make the permissible ratio of punitive to compensatory damages depend less on the factors we have stressed than on how egregious the defen-dant's wrongdoing was—the more egregious, the higher the permissible ratio. E.g., *Planned Parenthood of Columbia/ Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005). Egregiousness is of course highly relevant to the appropriateness of awarding punitive damages at all, and sometimes to the amount. But it is relevant to the ratio of punitive to compensatory damages only insofar as the greater the punitive damages are, the higher the ratio of punitive to compensatory damages is likely to be. The proper focus of analysis of the ratio itself is the adequacy of the combined award of compensatory and punitive damages to motivate the prosecution of a meritori-ous claim. If compensatory damages are slight, a single-digit ratio is likely to be insufficient. And that appears to be the case here.

We assume that the defendants would prefer to litigate the plaintiff's Illinois tort claim in federal court. But as they have never suggested diversity as a basis for citizenship, insisting instead on placing all their jurisdictional eggs in the SLUSA basket, there we shall leave them.

The judgment of the district court is reversed with instructions to vacate all previous rulings in the litigation and remand the case to the court from which it was removed.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*