## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## SIEBEL SYSTEMS, INC., Kenneth A. Goldman and Mark D. Hanson, Defendants.

### No. 04 CV 5130(GBD).

United States District Court,
S.D. New York.

Sept. 1, 2005.

James Andrew Meyers, Scott W. Friestad, Treasure R. Johnson, Washington, DC, for Plaintiff.

Steven Mark Schatz, Douglas John Clark, Wilson Sonsini Goodrich & Rosati, John Charles Dwyer, Cooley Godward LLP, Palo Alto, CA, for Defendants.

## MEMORANDUM DECISION AND ORDER

DANIELS, District Judge.

Plaintiff, the Securities and Exchange Commission ("SEC"), commenced this action, against Siebel Systems, Inc. ("Siebel Systems"), Siebel Systems's Chief Financial Officer, Kenneth Goldman, and one of Siebel Systems's Senior Vice Presidents, Mark Hanson. The SEC charges the defendants with, *inter alia*, violations of, or aiding and abetting in the violation of, Regulation FD ("Fair Disclosure"), 17 C.F.R. § 243.100. In general terms, Regulation FD prohibits a company and its senior officials from privately disclosing any material nonpublic information regarding the company or its securities to certain persons such as analysts and institutional investors.

Defendants moved, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief may be granted on the grounds that the statements disclosed were neither material nor nonpublic. Defendants' motion is granted. The nature and content of the statements that the SEC alleges violate Regulation FD do not support the Commission's claim that Siebel Systems or its senior officials privately disclosed material nonpublic information.

Regulation FD requires an issuer,[1] to make public material information disclosed to security market professionals or holders of the issuer's securities who are reasonably likely to trade on the basis of that information.[2] 17 C.F.R §§ 243.100;

1. An "issuer" is defined as "one that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781), or is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) ..." 17 C.F.R. § 243.101(b). Regulation FD also applies to any person acting on an issuer's be-

half which includes any senior official of the issuer. 17 C.F.R. § 243.101(c).

2. Regulation FD provides that "[w]henever an issuer, or any person acting on its behalf, discloses any material nonpublic information regarding that issuer or its securities to any person ..." "[w]ho is a broker or dealer," "an investment adviser," "an institutional in-

242.101(c), (f). Where the issuer's selective disclosure of material nonpublic information is intentional, the issuer is to simultaneously make public disclosure. 17 C.F.R. § 243.100(a)(1). In the case of non-intentional disclosure, public disclosure must be promptly made. 17 C.F.R. § 243(a)(2). " 'Promptly' means as soon as reasonably practicable (but in no event after the later of 24 hours or the commencement of the next day's trading on the New York Stock Exchange) after a senior official of the issuer, ... learns that there has been a non-intentional disclosure by the issuer or person acting on behalf of the issuer of information that the senior official knows, or is reckless in not knowing, is both material and nonpublic." 17 C.F.R. § 243.101(d).

The gravamen of the complaint is that defendant Goldman made positive comments about the company's business activity levels and sales transaction pipeline[3] at two private events on April 30th, 2003, attended by institutional investors and by defendant Hanson. The SEC alleges that, at these two events, Mr. Goldman privately disclosed material nonpublic information by stating that Siebel Systems's activity levels were "good" or "better," that new deals were coming back into the pipeline, that the pipeline was "building" and "growing," and that "there were some $5 million deals in Siebel's pipeline." (Compl.¶¶ 43, 48). The complaint alleges that immediately following the disclosure of this information or soon thereafter, certain attendants of the meetings and their associates made substantial purchases of shares of Siebel Systems's stock. The SEC alleges "by disclosing that Siebel's business activity levels were 'good' and 'better,' and that its sales transaction pipeline was 'growing' and 'building,' Goldman communicated to his private audiences that Siebel's business was improving as the result of new business, and that the increase in the Company's guidance for the second quarter was not simply because deals that had slipped from the first quarter were closing." (*Id.* ¶ 50).

The SEC claims that these statements materially contrasted with public statements made by Thomas Siebel[4] during conference calls on April 4th and 23rd, and at an April 28th conference.[5] In the

vestment manager," "an investment company," or "a person associated" "or affiliated" with such entities, or "[w]ho is a holder of the issuer's securities, under circumstances in which it is reasonably foreseeable that the person will purchase or sell the issuer's securities on the basis of the information," "the issuer shall make public disclosure of that information ... [s]imulatneously, in the case of an intentional disclosure; and [p]romptly, in the case of a non-intentional disclosure." 17 C.F.R. §§ 243.100(a)(1–2), (b)(1)(i–iv).

3. The SEC alleges that "[f]or shareholders or potential investors, information concerning the status of the Company's pipeline—whether it is lagging, static or growing—and the activity levels of the sale force—whether they are active or inactive—is important to making an investment decision because such information is an indicator of the Company's ability to generate revenues." (Compl.¶ 32).

4. The complaint indicates that Thomas M. Siebel is Siebel Systems's "founder and Chairman of the Board of Directors and was, until May 2004, its Chief Executive Officer." (Compl.¶ 15).

5. The public statements at issue are: an April 4th earnings warning and conference call; an April 23rd earnings announcement and conference call discussing the first quarter earnings, and to provide guidance for the second quarter of fiscal year 2003; and Mr. Siebel's April 28th speaking engagement, at a conference broadcasted to the public via the internet, which also provided guidance for the second quarter of fiscal year 2003. (Compl.¶¶ 31, 33–35, 37, 39). Other Siebel Systems's officers also spoke at the April 4th and April 23rd conference calls. The complaint focuses only on the public statements made by Mr. Siebel at those events.

complaint, the SEC sets forth, in great detail, the contents of Mr. Siebel's public statements of April 4th, April 23rd, and April 28th. Those statements provided information about the company's "performance in the first quarter of 2003 and its expected performance in the second quarter of 2003." (*Id.* ¶ 31). The SEC alleges that in these statements it was reported that: (1) Siebel Systems's first quarter results were poor because the economy was poor and because some deals that were expected to close in the previous quarter did not, *i.e.,* deals had "slipped" into the second quarter; (2) Siebel Systems's software license revenues were expected to be higher in the second quarter than in the first quarter, but the company conditioned its estimate on the performance of the overall economy; and (3) there were no indications that the existing poor economic conditions were approving. "In each statement, the Company [allegedly] characterized the economy negatively (as *not improved or not improving*)." (*Id.* ¶ 31). The complaint further states that, with regard to the guidance for the second quarter of fiscal year 2003, "[t]he Company conditioned its estimate on the performance of the overall economy. It said that if the economy improved, Siebel's business would improve, and that, conversely, if the economy did not improve, then Siebel's business would not improve." (*Id.* ¶ 34). The SEC alleges that the public statements "linked the Company's prospective performance to the economy's performance— that is, if the economy improved, Siebel's business would improve." (*Id.* ¶ 38).

The SEC contends that "[b]ased on these disclosures, the total mix of information available to investors was that Siebel's business had performed poorly in the first quarter and would improve in the second quarter only if the economy improved." (Pl.'s Opp'n Mem. at 10). Allegedly, Mr. Goldman's "statements materially contrasted with the public statements that Thomas Siebel made during the April 4 and 23 conference calls and at the . . . conference on April 28. For example, in contrast to the apocalyptic economic environment that Thomas Siebel described at the [April 28th] conference, Goldman's disclosure at the April 30 [events] were significantly more positive and upbeat. Unlike the Company's prior public disclosure about its prospective performance in the second quarter, Goldman's statements about the Company's business were not linked to or conditioned upon the performance of the economy." (Compl.¶ 49).

The complaint further alleges that analysts, who were participating in the April 23rd conference call and the April 28th conference, "wanted to know how much of the projected increase in software license revenues in the second quarter compared to the first quarter revenues was attributable to the deals that slipped from the first quarter as opposed to the Company's expectation that it would generate new business in the second quarter." (*Id.* ¶¶ 36, 38). The SEC alleges that when the analysts repeatedly inquired about the impact of the slipped deals on Siebel Systems's second quarter guidance, Mr. Siebel "avoided," "evaded," and "directly declined to answer the question." (*Id.* ¶¶ 36, 38). The SEC maintains that, publicly, "the total mix of information available to investors did not include information that would enable either analysts or investors to determine whether the increased guidance for the second quarter represented an improvement over the first quarter." (Pl.'s Opp'n Mem. at 11).

The complaint further alleges that Siebel Systems failed to file the requisite Form 8–K disclosing the material nonpublic information that Mr. Goldman had disclosed at the private meetings within the time frame specified by the SEC's rules,

nor did it "disseminate that information through another method of disclosure reasonably designed to provide broad, non-exclusionary distribution of the information to the public." (Compl.¶ 60).

## SCOPE OF REVIEW ON MOTION TO DISMISS

In reviewing a complaint for dismissal under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995). The complaint should only be dismissed where it appears beyond doubt that plaintiff can present no set of facts entitling it to relief. *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984). On a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the Court is precluded from considering matters outside of the complaint. *Courtenay Communications, Corp. v. Hall*, 334 F.3d 210, 213 (2d Cir.2003). In this regard, a complaint includes "documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)); *see also, Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995). However, plaintiff's mere notice or posses-sion of a document is not sufficient to warrant the Court's consideration of the document. Rather, plaintiff's *"reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002).

Defendants submitted, in support of their motion to dismiss, written transcripts of Siebel Systems's April 4th and April 23rd conference calls, and the April 28th conference statement, which are the public statements on which the SEC's complaint relies.[6] The SEC refers to all of these statements in its complaint. In fact, the complaint generally characterizes the content of these statements, as well as includes quoted sections thereof. Specific portions of Siebel Systems's public statements, alleged in the complaint, are utilized by the SEC in an attempt to demonstrate that Siebel Systems's public statements were contrary to, and lacked information contained in, Mr. Goldman's private statements. The SEC thereby alleges that the private statements constituted new, nonpublic material information.

The SEC contends that on a motion to dismiss, the Court must accept the allegations in the complaint as true and, with regard to the sufficiency of those allegations, limit its review solely to those portions of Siebel Systems's public statements to which the SEC refers in its complaint. The SEC, citing *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989), claims that the Second Circuit Court of Appeals has repeated-

---

6. The Court previously granted defendants' request to take judicial notice of the transcripts that the complaint relies upon. The Court, based on the allegations in the complaint, takes judicial notice of what was said at the April 4th, 23rd, and 28th conferences. The Court does not do so to resolve any factual disputes between the parties. The transcripts provide no further factual basis to support the conclusory allegations by the SEC that Mr. Goldman privately disclosed material nonpublic information. A review of the minutes from the conferences indicate that the SEC cannot cure the defective nature of its complaint.

ly held that a district court may not consider extraneous documents not attached to or incorporated in the complaint, even if the complaint contains limited quotations from those documents.

The Second Circuit has recognized that this "Circuit has pursued a somewhat uneven course in determining the extent to which the full text of the documents partially quoted in a complaint may be considered in ruling on a 12(b)(6) motion." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 808 (2d Cir.1996). The Second Circuit citing, *Cosmas, supra*, noted that previous cases have not permitted the district courts' consideration of the full text of documents quoted only to a limited extent in the complaint. *Id.* The Second Circuit, however, has more recently adopted the position that a document which is "integral" to the complaint may be considered by the district court, on a motion to dismiss, notwithstanding the fact that the complaint only contains " 'limited quotations from that document.' " *San Leandro*, 75 F.3d at 808 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co. Inc.*, 936 F.2d 759, 762 (2d Cir.1991)); *see also, Harsco Corp. v. Segui.*, 91 F.3d 337, 341 n. 1 (2d Cir.1996) (citation omitted) (finding that a letter, which was cited to and described in a complaint, may be reviewed in its entirety, on a motion to dismiss, even though it was not attached to the complaint).

The primary reason why a court is precluded from considering documents outside the complaint is because of plaintiff's lack of notice. Where plaintiff has actual notice of the documents and has utilized them in framing the complaint, the underlying rationale for precluding review of the documents no longer exists. *See, In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997) (finding that district court did not err in using informa-

tion contained in the company's annual report, which was neither attached to, nor referred to, in the complaint, as a basis for its materiality analysis.) (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993)). Moreover, permitting judicial review of documents used by a plaintiff in drafting the complaint prevents a plaintiff from maintaining a claim "by extracting an isolated statement from a document and placing it in a complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not [actionable]." *Id.* (citation omitted). In determining whether to consider documents not attached to the complaint, the critical question is whether the allegations in the complaint are based on those documents. A plaintiff cannot prevent the Court from examining their contents simply by failing to attach the documents to the complaint, or even by failing to explicitly cite to them in the complaint. *Id.* Review of the entire public statement at issue is particularly appropriate where the issue is the absence of material nonpublic information within that statement.

 A necessary element of a Regulation FD violation is that the subject statement was not publicly disclosed. The SEC selectively cites, in its pleadings, to isolated portions of Siebel Systems's public statements in support of its conclusory allegation that Siebel Systems failed to publicly disclose material information which Mr. Goldman privately disclosed. Regulation FD is aimed at prohibiting the selective disclosure of information, in order to promote the full and fair disclosure of information to the public. *Final Rule: Selective Disclosure and Insider Trading*, 65 Fed.Reg. 51716, 51716 (August 24, 2000) ("Adopting Release"). Nevertheless, the SEC argues that, on a motion to dismiss, judicial review is confined to a limit-

ed examination of the language highlighted by the SEC, without a consideration or assessment of the statement in the context of its overall public communication. The SEC's allegation is that the nature of the public statements was significantly different from the private statements. Those public statements therefore lacked information and constitutes non-disclosure of material nonpublic information which was privately disclosed. Since the SEC relied on the non-disclosure in the public statements, as an integral component in the framing of its complaint, the full content of the statements, as oppose to the limited portions the SEC selectively decided to include in the complaint, is properly considered by the Court.

## VIOLATION OF REGULATION FD

The complaint alleges four nonpublic material disclosures made by Mr. Goldman which are the basis for the SEC's claims for violations of Regulation FD: (1) that there were some *five million dollar deals* in the company's pipeline for the second quarter of 2003; (2) that *new deals* were coming into the sales pipeline; (3) that the company's sales pipeline was *"growing"* or *"building;"* and (4) that the company's sales or business activity levels were *"good"* or *"better."* The complaint relies on no statements regarding specific earnings or sales figures. Defendants argue that dismissal of the complaint is warranted because the four statements at issue cannot support a conclusory allegation that these statements were either material or nonpublic.

Regulation FD does not contain definitions for the terms "material" or "nonpublic." In the SEC's release discussing the proposed adoption of the regulation ("Proposing Release"), the SEC "recognize[d] that materiality judgments can be difficult." *Proposed Rule: Selective Disclosure and Insider Trading,* 64 Fed.Reg. 72590, 72594 (Dec. 28, 1999) ("Proposing

Release"). The SEC observed that the proposed regulation could have a "chilling effect" in that "[c]orporate officials [might] become more cautious in communicating with analysts or selected investors," especially since such communications may take the form of "unrehearsed question-and-answer sessions, and responses to unsolicited inquiries." *Id.* Thus, the SEC noted it was "mindful of the potential burdens of requiring instant materiality judgments to be made by those put in the position of responding immediately to questions." *Id.* Despite the SEC's concession that materiality determinations are difficult, the SEC nevertheless suggested that in most cases, the question of whether information was material will be reasonably clear. The SEC explained,

> Although materiality issues do not lend themselves to a bright-line test, we believe that the majority of cases are reasonably clear. At one end of the spectrum, we believe issuers should avoid giving guidance or express warnings to analysts or selected investors about important upcoming earnings or sales figures; such earnings or sales figures will frequently have a significant impact on the issuer's stock price. On the other end of the spectrum, more generalized background information is less likely to be material. *Id.* at 72595.

In the SEC's Adopting Release, the SEC again noted the frequently expressed concern that the regulation would not lead to broader dissemination of information, but would instead have a "chilling effect" on disclosure of information by the issuer. 65 Fed.Reg. 51716, 51718. The potential chilling effect could conceivably result in the issuers "speak[ing] less often out of fear of liability based on a post hoc assessment that disclosed information was material," and "such a chilling effect result[ing] from Regulation FD [ ] would be a cost to the overall market efficiency and capital formation." *Id.* at 51733.

In response to this concern and in recognizing that the market is best served by more, rather than less, disclosure of information by issuers, the SEC modified the proposed Regulation FD to include certain safeguards to narrow the applicability of Regulation FD so as not to diminish the flow of information.[7] Despite its previous acknowledgment, in the Proposing Release, that materiality judgments can be difficult, the SEC did not find that the "appropriate answer to this difficulty is to set forth a bright-line test, or an exclusive list of material items for purpose of Regulation FD." *Id.* at 51721. Although the SEC declined to set forth an all-inclusive list of what matters are to be deemed material, it did provide seven categories of information or events that have a higher probability of being considered material. The seven enumerated categories are:

(1) Earnings information; (2) mergers, acquisitions, tender offers, joint ventures, or changes in assets; (3) new products or discoveries, or developments regarding customers or supplies (e.g., the acquisition or loss of a contract); (4) changes in control or in management; (5) change in auditors or auditor notification that the issuer may no longer rely on an auditor's audit report; (6) events regarding the issuer's securities— e.g., defaults on strict securities, calls of securities for redemption, repurchase plans, stock splits or changes in dividends, changes to rights of security holders, public or private sales of additional securities; and (7) bankruptcies and receiverships. *Id.*

The specific matters included in the list, however, are not *per se* material.[8]

7. "In response to the comments [the SEC] received on the proposal, [the SEC has] made several modifications ... in the final rules." *Id.* at 51716. "These modifications include narrowing the scope of the regulation so that it does not apply to all communications with persons outside the issuer, narrowing the types of issuer personnel covered by the regulation to senior officials and those who would normally be expected to communicate with securities market professionals or security holders, and clarifying that where the regulation requires 'knowing or reckless' conduct, liability will attach only when the issuer's personnel know or are reckless in not knowing that the information selectively disclosed is both material and nonpublic. Additionally, ... [the SEC] added an express provision in the regulation's text designed to remove any doubt that private liability will not result from a Regulation FD violation." *Id.* at 51733, *see also, Id.* at 51719

8. On November 1, 2000, approximately a week after Regulation FD became effective, then-Director of the SEC Division of Enforcement, Richard H. Walker, gave a speech before the Compliance and Legal Division of the Securities Industry Association regarding the enforcement perspective of Regulation FD. Former–Director Walker indicated that in enforcing Regulation FD, the SEC was "not going to second-guess close calls regarding the materiality of a potential disclosure" noting that "[a]n issuer's incorrect determination that information is not material must represent an extreme departure from standards of reasonable care in order for [the SEC] to allege a violation of FD." *reprinted at* 2000 WL 1625668, at *3. He further stated, "Regulation FD's adopting release ... spells out seven items that should be reviewed carefully to determine whether they are material ... This list puts the world on notice that an intentional or reckless selective disclosure of information falling into one of these categories is likely to draw the attention of the Enforcement Division." *Id.* at *3

The views expressed in Mr. Walker's speech were his own and did not necessarily reflect the views of the SEC or its staff. *Id.* at *1. However, in May of 2001, the SEC quoted and summarized portions of Mr. Walker's speech, wherein he indicated "that Regulation FD was not designed as a 'trap for the unwary' and that enforcement cases will not be based on second-guessing reasonable judgments made in good faith by issuers, including judgments about materiality." Written Statement Concerning Regulation Fair Disclosure of the U.S. Securities and Exchange Commission Before the Subcommittee on

Although Regulation FD does not contain definitions for the terms "material" or "nonpublic," the Adopting Release advises that those terms are to be defined as they have been in previous case law. Fed.Reg. 51716, 51721. With regard to the "nonpublic" element, the Adopting Release relied on the finding in *SEC v. Texas Sulphur Co.*, 401 F.2d 833, 854 (2d Cir.1968), that information is nonpublic if it has not been disseminated in a manner sufficient to ensure its availability to the investing public. *Id.* As the Second Circuit Court of Appeals explained, in *SEC v. Mayhew*, 121 F.3d 44 (2d Cir.1997):

> Information becomes public when disclosed to achieve a broad dissemination to the investing public generally and without favoring any special person or group, or when, although known only by a few persons, their trading on it has caused the information to be fully impounded into the price of the particular stock. *Mayhew*, 121 F.3d at 50 (internal quotation marks and citations omitted).

With regard to the definition of "materiality," the Adopting Release embraced the definition set forth in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), concluding that "[i]nformation is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision." Fed. Reg. 51716, 51721 (quoting *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126 (1976)). To satisfy the materiality element, there must be a substantial likelihood that a reasonable investor would have considered the information as having significantly altered the 'total mix' of information made available. *Id.* (quoting *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126); *see also*

*Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Mayhew*, 121 F.3d at 52. The "total mix" of information includes all information that is reasonably available to the public. *Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir.2005) (quoting *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir.2000)). It is not a prerequisite to a finding of materiality that had a reasonable investor been privy to the information, the investor would necessarily have changed his or her investment decision as a result of that information. *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126; *Mayhew*, 121 F.3d at 52 (citations omitted); *see also, Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir.1991) (citation omitted) ("material fact need not be outcome-determinative," but rather it is sufficient that the information would assume actual significance to a reasonable investor). Information that would affect the probable future of the company and which may affect an investor's desire to buy, sell, or hold the company's securities is material. *Texas Gulf Sulphur Co.*, 401 F.2d at 849. "Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. \* \* \* [I]f the standard of materiality is unnecessary low, not only may the company and its management be subjected to liability for insignificant [nonpublic selective disclosure], but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information, a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc.*, 426 U.S. at 448–49, 96 S.Ct. 2126.

The question of materiality generally presents a mixed question of law and fact,

Capital Markets, Insurance and Government Sponsored Enterprises Committee on Financial Services United States House of Representatives, 2001 WL 634672, at \*7 (May 17,

2002). The SEC noted that "[t]hese remarks ... have indicated that Commission enforcement of the regulation will be focused on clear violations." *Id.*

as it involves the application of a legal standard to a particular set of facts. *TSC Indus., Inc.*, 426 U.S. at 450, 96 S.Ct. 2126; *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir.2000). The question of materiality is, however, an objective one, involving the significance of the information to a reasonable investor. *TSC Indus., Inc.*, 426 U.S. at 445, 96 S.Ct. 2126 (1976). "[S]ince the importance of a particular piece of information depends on the context in which it is given, materiality has become one of the most unpredictable and elusive concepts of the federal securities laws." *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 10 (2d Cir.1977). A determination with regard to materiality is a fact-specific inquiry to be determined on a case-by-case basis. *Basic*, 485 U.S. at 240, 250, 108 S.Ct. 978. A complaint may only be dismissed on the grounds that the alleged private disclosure of information was immaterial if the subject information is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Hence, where the subject statements are so blatantly unimportant, it is appropriate for the Court to rule, as a matter of law, that the statements do not meet the materiality threshold, and to dismiss the complaint. *See, Schoenhaut v. Am. Sensors, Inc.*, 986 F.Supp. 785, 790–91 (S.D.N.Y.1997) (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d at 1429).

■ In applying the aforementioned principles to the case at bar, the allegations in the complaint fail to demonstrate that Regulation FD was violated. Regulation FD was never intended to be utilized in the manner attempted by the SEC under these circumstances. The statements relied upon in the complaint cannot support a conclusion that material information privately provided by Mr. Goldman was unavailable to the public. Specifically, Mr.

Goldman's private statement regarding the existence of five million dollar deals in the company's pipeline for the second quarter was equivalent in substance to the information previously disclosed by Mr. Siebel. With regard to the guidance for the second quarter, Mr. Siebel stated at the April 23rd conference call:

> Our guidance and license revenue for the quarter is 120 to 140 million range. I think that we'll see lots of small deals. We'll see some medium deals. We'll see a number of deals over a million dollars. And I suspect we'll see some *greater than five*. And now that's what the mix will look like. (Dunning Decl., Ex. 2 at 7) (emphasis added).

The SEC argues that Mr. Goldman's statement, in contrast, was in the *present* tense, and hence constitutes a factually different material statement than that made by Mr. Siebel. The SEC contends that unlike Mr. Goldman's statement, Mr. Siebel's statement was in the *future* tense, and Mr. Siebel's use of the word "suspect" indicates his statement was not a present fact, but rather was forward looking.

It would appear that in examining publicly and privately disclosed information, the SEC has scrutinized, at an extremely heightened level, every particular word used in the statement, including the tense of verbs and the general syntax of each sentence. No support for such an approach can be found in Regulation FD itself, or in the Proposing and Adopting Releases. Such an approach places an unreasonable burden on a company's management and spokespersons to become linguistic experts, or otherwise live in fear of violating Regulation FD should the words they use later be interpreted by the SEC as connoting even the slightest variance from the company's public statements.

■ Regulation FD does not require that corporate officials only utter verbatim

statements that were previously publicly made. In *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 584 F.2d 1195 (2d Cir. 1978), which concerned the adequacy of a proxy disclosure, the Second Circuit advised that, in analyzing the disclosure of material statements, "nit-picking should not become the name of the game. * * * There is no requirement that a material fact be expressed in certain words or in a certain form of language. Fair accuracy, not perfection, is the appropriate standard." *Kennecott Copper Corp.*, 584 F.2d at 1200 (quotation marks and citations omitted). To require a more demanding standard, in the context of Regulation FD, could compel companies to discontinue any spontaneous communications so that the content of any intended communication may be examined by a lexicologist to ensure that the proposed statement discloses the exact information in the same form as was publicly disclosed. If Regulation FD is applied in such a manner, the very purpose of the regulation, *i.e.*, to provide the public with a broad flow of relevant investment information, would be thwarted.

Mr. Goldman's private statement regarding the existence of five million dollars deals in the company's pipeline for the second quarter was equivalent in substance to the information publicly disclosed by the company in that it conveyed the same material information. As long as the private statement conveys the same material information that the public statement publicly conveyed, Regulation FD is not implicated, and hence no greater form of disclosure, pursuant to the regulation, is required. Although Mr. Goldman's statement was not literally a word for word recitation of Mr. Siebel's disclosure, both provided the same information, and Mr. Goldman's statement did not add, contra-

dict, or significantly alter the material information available to the general public. It therefore cannot constitute a sufficient factual basis on which to allege a nonpublic disclosure of material information in violation of Regulation FD.

■ Similarly unavailing are the SEC's claims that Mr. Goldman's private statements regarding new business in the pipeline and that the pipeline was "growing" or "building" was information which was not previously disclosed to the public. The SEC argues that Mr. Siebel "did not describe the status of the Company's pipeline." (Pl.'s Opp'n Mem. at 6). However, at the April 23rd conference call, a question was posed regarding the makeup of the pipeline with respect to "new versus exist[ing] customers." The verbatim transcript on which the SEC relies indicates that in response thereto, Mr. Siebel publicly stated, "every quarter will be some place between 45 and 55 percent of our business with new customers." (Dunning Decl., Ex. 2, at 12). Such a statement clearly indicated that the second quarter pipeline would include new deals.

Mr. Goldman's private description of the pipeline as "growing" or "building" provides no additional material information that was not previously publicly disclosed by the company. The complaint acknowledges Siebel Systems's April 23rd and 28th public statements that "the Company projected that its software license revenues would be in the range of $120 to $140 million, which was more than the Company's reported revenues for the first quarter." (Compl.¶ 34). Moreover, the company publicly disclosed that the projected total revenues for the second quarter appeared to be in the 340 to 360 million dollar range, which was greater than the reported total revenues for the first quarter.[9] (Dunning Decl., Ex. 2, at 7). Additionally, at the April 23rd conference call,

---

**9.** At the April 23rd conference call, a Siebel Systems's executive began by noting that the first quarter total revenues were 333 million

dollars and that the license revenues were 112 million dollars. (Dunning Decl., Ex. 2, at

Mr. Siebel explained that the anticipated increase in the license revenues was based on an analysis of the pipeline.[10] At the April 28th conference, Mr. Siebel again explained that the projected increase was Siebel Systems's "best professional judgment based upon the pipeline with the deals that we saw . . ." (*Id.*, Ex. 3, at 26).[11] Siebel Systems's public statements clearly disclosed that it was projecting an increase in revenues in the second quarter, and that this expectation was based, in part, upon an analysis of the pipeline. Based on this information, a reasonable investor would be aware that the sales pipeline was "growing" and "building." Hence Mr. Goldman's private wording, to that effect, added nothing to the total mix of information publicly available.

■ The SEC further alleges that Regulation FD was violated as a result of Mr. Goldman's private statements that Siebel Systems's sales or business activity levels were "good" or "better." Mr. Goldman's private statement that the activity levels were "good" or "better" was based on information available to the public since Siebel Systems publicly reported that it anticipated a future increase in the company's performance. The terms "better" and "good" are merely generalized descriptive labels based on the underlying quantitative information provided publicly by Siebel Systems. Given the detailed and specific information revealed in the company's public disclosures, Mr. Goldman's description of the company's performance and activity level as being "good" and "better" imparted no greater information to his private audiences than Siebel Systems had already disclosed to the public at large. Hence, the statements regarding the company's performance or activity levels being "good" or "better" did not alter the total mix of information already available to the reasonable investor.

The SEC maintains that Mr. Goldman's statements constituted nonpublic material information because his statements forecasted overall positive growth for the company, whereas the company's public statements avoided making such a positive affirmation. Although the SEC is not disputing that the public information was that the second quarter guidance was higher than the first quarter's actual results, the SEC asserts that this is not dispositive of whether business was improving. However, the information available to the public provides a sufficient factual basis for a reasonable investor to conclude that business was improving.

2). Thus, the company publicly disclosed information from which it could be concluded that the company was projecting that, from the first quarter to the second quarter, total revenues would increase from 333 million dollars to somewhere between 340 to 360 million dollars, and that license revenues would increase from 112 million dollars to somewhere between 120 to 140 million dollars.

10. On April 23rd, Mr. Siebel stated:

I think the license range that we've give[n] from 120 to 140, we've done a very, very thorough analysis of our pipeline, we've done top down forecasting, bottom up forecasting, deal by deal forecasting. As you can well imagine. And in our best professional judgment at this time that's where our license revenue will come out. (*Id.*, Ex. 2 at 8).

11. On April 28th, Mr. Siebel indicated:

Now is this based [the guidance provided] upon the business conditions, based upon the size of the pipeline, based upon what we saw in the market, this is what our best professional estimates as to where, we provided our best professional estimate in the short term as to what we think will happen. And that you know, that's just the best we could do. Could be wrong? We could be wrong. Could we be on the high side, we could be. Could we be on the low side, we could. It's our best professional judgment based upon the pipeline, with deals that we saw, business activity, kind of business conditions. (*Id.*, Ex. 3 at 26).

The SEC places great emphasis on the alleged actions taken by certain individuals who were in attendance at Mr. Goldman's private speaking engagements. The complaint alleges that certain attendees, and other individuals with whom they communicated, purchased Siebel Systems stock almost immediately after Mr. Goldman's private statements or soon thereafter, causing the market for Siebel Systems stock to significantly rise and for trading to surge. The SEC argues that taking these allegations as true, and drawing all reasonable inferences in its favor, leads to the conclusion that Mr. Goldman disclosed information that was both new and material.

A major factor in determining whether information is material is the importance attached to it by those who were exposed to the information as may be expressed by their reaction to the information. *Mayhew,* 121 F.3d at 52 (citing *Texas Gulf Sulphur Co.,* 401 F.2d at 851); *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166–67 (2d Cir. 1980). Although stock movement is a relevant factor to be considered in making the determination as to materiality, it is not, however, a sufficient factor alone to establish materiality. *United States v. Bilzerian,* 926 F.2d 1285, 1298 (2d Cir.1991).

An examination of the public and private statements do not support a conclusory allegation that Mr. Goldman's statements were the disclosure of nonpublic material information. The actions taken by those in attendance at Mr. Goldman's speaking engagements, although a rele-

vant consideration, do not change the nature or content of Mr. Goldman's statements. Regulation FD deals exclusively with the disclosure of material information. The regulation does not prohibit persons speaking on behalf of an issuer, from providing mere positive or negative characterizations, or their optimistic or pessimistic subjective general impressions, based upon or drawn from the material information available to the public. The mere fact that analysts might have considered Mr. Goldman's private statements significant is not, standing alone, a basis to infer that Regulation FD was violated. *See,* 65 Fed.Reg. 51716, 51722 ("Regulation FD will not be implicated where an issuer discloses immaterial information whose significance is discerned by the analyst. * * * The focus of Regulation FD is on whether the issuer discloses material nonpublic information, not on whether an analyst, through some combination of persistence, knowledge, and insight, regards as material information whose significance is not apparent to the reasonable investor.").

■ The SEC further argues that Mr. Goldman's statements "constituted new information" because they were not "conditioned upon nor qualified by the performance of the economy," and therefore they "contrasted with the Company's prior statements and altered the total mix of information available to investors," which included, "that Siebel's business had performed poorly in the first quarter and would improve in the second quarter only if the economy improved." [12] (Pl.'s Opp'n Mem. at 10, 11).

12. It should be noted that although Mr. Siebel indicated that the economy would play a role in Siebel Systems's future performance, he did not state that absent economic growth, the company would not grow at all. On April 4th, Mr. Siebel noted that, "although we continue to be affected by the macroeconomic environment, we remain optimistic about the company's strategy and the company's business prospects." (Dunning Decl., Ex. 1, at 5). Additionally, Mr. Siebel stated during the April 23rd conference call:

The economy—— where we are we have a company we think we're very well positioned. We have exceptionally strong product set, we're financially rock solid. We

It would be an unusual rule, indeed, to require that forecasts must repeatedly be accompanied by a warning that company performance might be affected by an improving or worsening economy. However, even if the potential effects of the economy constituted material information,[13] Siebel Systems had publicly disclosed that the performance of the company was linked to the performance of the economy. What Regulation FD does not require is that an individual, speaking privately on behalf of an issuer, repeat material information which has already been previously publicly proclaimed. *See, Spielman v. Gen. Host Corp.*, 402 F.Supp. 190, 195 (S.D.N.Y.1975), *aff'd*, 538 F.2d 39 (2d Cir.1976). Mr. Goldman's alleged failure to qualify his private statement about the company's performance, by linking it to, or conditioning it upon, the performance of the economy, cannot be alleged as a private disclosure of nonpublic information. Regulation FD only pertains to the re-

quired public disclosure of information, not the failure to repeat a particular public statement in private.[14]

Significantly, none of the statements challenged by the SEC falls squarely within the seven enumerated categories listed by the SEC, in the Adopting Release, as being more likely to be considered material. Applying Regulation FD in an overly aggressive manner cannot effectively encourage full and complete public disclosure of facts reasonably deemed relevant to investment decisionmaking. It provides no clear guidance for companies to conform their conduct in compliance with Regulation FD. Instead, the enforcement of Regulation FD by excessively scrutinizing vague general comments has a potential chilling effect which can discourage, rather than, encourage public disclosure of material information.

In accepting the factual allegations in the complaint as true and drawing all rea-

have enormous loyalty in our customer base. I think we are very, very well positioned to take advantage of this market when it expands. We have our foot kind of poised over the accelerator so that when this market expands I believe that we're positioned to jump on the opportunity and this business will expand at a greater rate than most information technology companies. * * * If the economy expands in the second quarter or the third quarter or the fourth quarter or the first quarter of next year Siebel Systems will grow and will grow significantly. If the economy does not expand Siebel System[s] will not grow significantly during that period of time. (*Id.*, Ex. 2, at 7)

13. It is doubtful that a company's disclosure regarding its prospective performance being "linked to or conditioned upon the performance of the economy" would constitute material information. It is a fundamental and basic principle that the economy effects corporate America. Information which is so basic that a reasonable investor could be expected to know it does not constitute material facts. *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 702 (2d Cir.1998); *see also, In re North-*

*ern Telecom Ltd. Sec. Litig.*, 42 F.Supp.2d 234, 236 (S.D.N.Y.1998) (statement that company would "be in good shape" if economy took an upward turn was merely an expression of corporate optimism which is too indefinite to be actionable under the securities laws.). "The role of the materiality requirement is not to 'attribute to investors a child-like simplicity,' as it is unreasonable to assume investors are 'nitwits' unable to appreciate the fundamental risks associated with the stock market." *See, Basic*, 485 U.S. at 234, 108 S.Ct. 978 (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175, (7th Cir.1987)); *see also, Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y.1967) ("[C]orporations are not required to address their stockholders as if they were children in kindergarten.").

14. Although Regulation FD pertains solely to disclosure of information, the challenged communication need not be an expressed verbal or written statement. Tacit communications, such as a wink, nod, or a thumbs up or down gesture, may give rise to a Regulation FD violation.

sonable inferences in the SEC's favor, the statements relied upon in the complaint fail to support its conclusory allegation that material information disclosed by Mr. Goldman in private, had not already been publicly disclosed by Siebel Systems.[15] Accordingly, the complaint fails to sufficiently allege that Regulation FD was violated.[16] Except with regard to the sixth cause of action against Siebel System for violation of its duty to maintain adequate disclosure controls and procedures to ensure compliance with Regulation FD, the SEC does not dispute that, absent a violation of Regulation RD, its other remaining claims fail to state a viable cause of action.

## THE SIXTH CAUSE OF ACTION

The sixth claim is asserted against Siebel Systems for violation of the disclosure control provisions of § 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13a–15 thereunder. The complaint alleges that Siebel Systems failed to maintain disclosure controls and procedures designed to ensure the proper and timely handling of information required to be disclosed in the reports filed

or submitted under the Exchange Act, and to ensure that management has the information it needs to make timely disclosure decisions. The SEC alleges that defendant Hanson "had [the] responsibility for overseeing the Company's compliance with Regulation FD" and that he was "directed [ ] to ensure that the Company did 'everything . . . possible' to comply with Regulation FD." (Compl.¶ 26). It is further alleged that "[n]either Hanson nor . . . his staff received any formal training regarding Regulation FD" "[n]or did Hanson promulgate a formal Company policy regarding compliance with Regulation FD or implement additional safeguards to ensure that Siebel's senior officials did not disclose material nonpublic information in circumstances where such information would not be simultaneously disseminated to the public." (*Id.* ¶ 27). The SEC alleges that "Hanson considered compliance with Regulation FD to be a low priority," as evidenced by the fact that the last item appearing on Mr. Hanson's prioritized list of business objectives was to " 'fully comply with Regulation FD.' " (*Id.* ¶ 28). After Mr. Goldman's speaking engagements, Mr.

---

15. Since the complaint fails to demonstrate that Mr. Goldman selectively disclosed non-public information, the Court need not resolve defendants' alternative argument that the challenged statements are not material because they merely constitute corporate optimism or other non-actionable puffery. Expressions of puffery and corporate optimism generally refer to forward looking statements. In light of the particularized material information provided to the public by Siebel Systems, Mr. Goldman's vague and generalized descriptive expressions did not convey any definitive representations or guarantees regarding the company's growth rate or its pipeline. To be deemed to be material, the statement must "contain information of reasonable specificity or impart a definite indicia of performance;" [and a statement is not material if] "it constitutes nothing more than a vague assertion on which no reasonable investor would rely." *See, Schoenhaut,* 986 F.Supp. at 791.

16. Defendants additionally raise the following constitutional challenges to Regulation FD: (1) the SEC lacked the statutory authority to promulgate the regulation; (2) the regulation abridges the freedom of speech protected by the First Amendment; (3) the regulation is void for vagueness in violation of the Due Process Clause of the Fifth Amendment; and (4) the regulation is unconstitutional as applied. The issues regarding the SEC's authority to adopt Regulation FD and whether the regulation violates the First Amendment's right to free speech were raised in an *amicus curiaei* brief, submitted by the Chambers of Commerce of the United States in support of the defendants' motion to dismiss, and addressed in an *amicus curiae* brief, submitted by a group of law professors in opposition to the motion. Since the complaint itself fails to allege a cognizable cause of action for violation of Regulation FD, this Court declines to opine on the constitutional challenges raised.

Hanson allegedly consulted with Siebel Systems's general counsel to discuss whether public disclosure was necessary. (*Id.* ¶ 57). Mr. Hanson allegedly did not reveal to Siebel Systems's general counsel that Mr. Goldman had made private statements about the company's activity levels and its transaction pipeline. (*Id.*).

There are no factual allegations, in the complaint, to independently support this cause of action absent of the SEC's claimed violation of Regulation FD arising from Mr. Goldman's statements. The complaint alleges that "Siebel did not record or memorialize what Goldman said at [the private meetings.]" (*Id.* at ¶ 59). The complaint further alleges that "Siebel failed to file with the [SEC] the required Form 8–K disclosing the material nonpublic information that Goldman had disclosed [at the private meetings] within the time period specified in the [SEC's] rules or forms, or to disseminate that information through another method of disclosure reasonably designed to provide broad, non-exclusionary distribution of the information to the public." (*Id.* at ¶ 60). However, the complaint fails to set forth sufficient factual allegations to establish that Mr. Goldman selectively disclosed nonpublic material information. Hence, to the extent that the SEC seeks to premise the sixth cause of action upon Siebel Systems's lack of controls and procedures to prevent Mr. Goldman's alleged selective disclosure of nonpublic material information, the sixth claim must fail.

The complaint is bereft of any particular factual allegations demonstrating that Siebel Systems did not have sufficient controls and procedures in place to enable the company to fully comply with Regulation FD. The statements relied upon by the SEC in its complaint do not support an allegation of nonpublic material disclosure. The complaint contains only conclusory assertions that Siebel Systems failed to maintain controls and other procedures designed to ensure that nonpublic material information is publicly disclosed within the required time period specified in the SEC's rules and forms. The sixth claim cannot survive solely on the basis of these conclusory allegations. *See, De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (The Court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion.); *see also, Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (" 'Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.' ") (quoting *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000)).

The defendants' motion to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), is granted. The case is dismissed in its entirety.

SO ORDERED.